# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### May 8, 2001 Session

## STATE OF TENNESSEE v. JERRY MAXWELL

**Direct Appeal from the Criminal Court for Gibson County**
**No. 15756    J. Steven Stafford, Judge**

---

**No. W2000-01947-CCA-R3-CD  - Filed June 7, 2001**

---

Defendant, the attorney for the Dyer Industrial Development Board, was convicted by a Gibson County jury of theft over $60,000 and theft over $1,000.  On appeal, he contends the evidence was insufficient to establish guilt.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., and L. TERRY LAFFERTY, SR. J., joined.

J. Brook Lathram, Memphis, Tennessee, and Todd A. Rose, Paris, Tennessee, for the appellant, Jerry Maxwell.

Paul G. Summers, Attorney General and Reporter; Mark E. Davidson, Assistant Attorney General; Alfred L. Earls and Kevin J. Youngberg, Assistant District Attorneys General *Pro Tem,* for the appellee, State of Tennessee.

## OPINION

Defendant was convicted with regard to his handling of funds belonging to the Dyer Industrial Development Board in his capacity as its attorney.  He contends the state failed to establish beyond a reasonable doubt that he acted with the intent to deprive the Board of its property.  Furthermore, with regard to the conviction for theft over $1,000, he contends the state failed to prove beyond a reasonable doubt that he acted without the Board's consent with regard to the handling of the funds.  We affirm the judgment of the trial court.

# FACTS

The defendant was an attorney who practiced law in Dyer, Tennessee. He represented the Dyer Industrial Development Board (hereinafter "Board") continuously from its incorporation in 1972 until his termination in 1998. The Board was a not-for-profit public corporation whose objective was to promote industry in the local area. *See* Tenn. Code Ann. § 7-53-102. In fulfilling its corporate purpose, the Board would construct and sell buildings to industries. The corporate charter provides that any net earnings of the Board were to be paid to the municipality of Dyer. These theft charges centered around two sales of property by the Board and the defendant's handling of the funds. The defendant did not testify at trial; thus, the following facts were established through the testimony of other witnesses.

## A. Kellwood Transaction – Theft Over $60,000

The conviction for theft over $60,000 arose from the sale of property by the Board to Kellwood Company for $425,000 on September 20, 1996. The check was made payable to the Board; however, the defendant deposited the funds into his law practice trust account. The defendant concedes in this appeal that he did not have the authorization to deposit these funds into his account.

Upon depositing the $425,000, the defendant wrote checks payable to two different banks totaling over $263,000 on behalf of the Board in payment of certain loans. Defendant also wrote himself a check in an amount over $1,700 for attorney's fees associated with the Kellwood transaction. This left approximately $160,000 due the Board; however, the defendant did not give these funds to the Board. Instead, the defendant used these funds to cover seven checks written a week earlier on the trust account to heirs of an estate. Had this deposit not been made to the trust account, the account would have had a negative balance of over $165,000.[1]

Tom Blakemore, Chairman of the Industrial Board, testified that the Board had its own bank account, and the defendant was not authorized to deposit Board funds into his account. He did not realize any funds were missing from the Board's bank account until around June 1997, when he discovered the Board's bank account only had approximately $400 in it. He then called a meeting of the Board and questioned the defendant as to the missing funds. The defendant falsely stated to the Board that the money was invested in Atlanta, Georgia. The Board mistakenly assumed the defendant was truthful.

On July 11, 1997, the defendant submitted a financial statement to First State Bank in Kenton, Tennessee, in connection with a personal loan and listed a $160,000 "note payable to others unsecured." At some point after September 1996 and prior to January 1998, the defendant gave his wife an undated, handwritten list of assets and liabilities in connection with their divorce

---

[1] It is unclear in the record as to why the trust account had insufficient funds to cover these seven checks, each in the amount of $35,000. However, it is apparent that the defendant was not in compliance with the ethical requirements of the Code of Professional Responsibility. *See* Tenn. Sup. Ct. R. 8, DR 9-102.

proceedings. The handwritten list contained a notation of a debt of $165,000 to the Board as "atty for Board." However, the defendant's sworn answers to interrogatories in the divorce proceedings dated November 2, 1997, did not reveal this indebtedness or any other indebtedness to the Board.

The Board met again on November 6, 1997, and discussed money that it owed to the City of Dyer. The Board requested that the money "invested in Atlanta" be transferred to the local bank within five days.

At the December 16, 1997, meeting of the Board, the defendant advised the Board that the Atlanta investment funds would be forthcoming that week. A demand letter was sent by the Board to the defendant to deposit the funds by December 19, 1997. This deadline was not met, and the Board on January 2, 1998, terminated the services of the defendant. A state audit was authorized at this January 2nd meeting.

The defendant repaid the amount due the Board on the Kellwood transaction plus 6¼% interest by two checks dated January 6 and 8, 1998.

An audit by a fraud examiner with the state comptroller's office began on January 13 or 14, 1998. When questioned by the fraud examiner, the defendant stated he had "borrowed the money to invest." The defendant also secured from his office and produced for the fraud examiner a note dated September 21, 1996, payable "on demand" to the Board in the amount of "$161,000 @ 6¼%." However, Blakemore testified that the Board never authorized or approved such a loan. The minutes support Blakemore's testimony. Furthermore, Blakemore testified that he had never seen the alleged promissory note until after the audit had begun.

Blakemore also testified that the Board had outstanding loans from the time the defendant deposited the funds until he repaid them. According to Blakemore, the loans ranged from 7% to 8¼%, and these funds could have been used to make payments on this indebtedness. Blakemore also testified that the defendant had always been paid his attorney's fees in the past from the Board's bank account.

The defendant was interviewed by auditors and TBI Special Agent Roger Hughes on January 18, 1998. The defendant stated he met with Blakemore and Board member Reed Wright at a local restaurant on September 21, 1996, and secured their approval to borrow the $160,000 at 6% interest. Defendant said he told them this was more than the 4% interest the bank paid and further told them it "wouldn't show up on the [bank records] ...." He stated that he executed a promissory note at that time.[2]

The defendant acknowledged during the interview that he could not have paid the estate distribution checks unless he deposited the Kellwood funds into his trust account. He further

---

[2] As previously stated, the written promissory note was actually in the amount of $161,000 at 6¼% interest.

admitted falsely telling the Board that he had invested the money in Atlanta, Georgia. He blamed "city politics" for the investigation since he, Blakemore and Wright "felt we needed to hide this money to keep it from being cabbaged or to keep the city from spending it rather than the Industrial Board." The defendant then reversed an earlier statement and said, "I can't swear I told Wright and Blakemore that I personally borrowed this money, but they got the money back at 6¼% interest."

The defendant further stated in the interview that he could not recall where he invested the Kellwood funds, and he made no attempt to keep these funds separate from his other assets since he considered the $160,000 a loan to him personally. He contended he borrowed these funds in order to protect the Industrial Board from the "city politics" that existed at the time.

The defendant was asked during the interview if there were any transactions prior to the Kellwood transaction in which he deposited Board funds into his trust account. He stated that all prior payments went directly to the bank, and he had not handled any prior funds.

## B. Wis–Con Transaction – Theft over $1,000

After interviewing the defendant in January 1998, the auditors examined the defendant's banking records beginning in 1994, particularly in view of defendant's statement in his interview that he had not handled Board funds from sales prior to the Kellwood transaction. Those records revealed that the Board sold property to Wis–Con on September 1, 1994, for the amount of $320,000, and the defendant deposited these funds into his trust account. The defendant then paid two Board loans leaving an approximate balance of $8,000 in his trust account. These funds were not paid to the Industrial Board or to the City of Dyer.

In response to a routine inquiry by the Board's private auditing firm, the defendant on January 6, 1996, advised the auditing firm by letter that the Board owed him for legal work performed from September 1994 to December 31, 1995, in the total amount of $5,118.75, "leaving the sum of $1,140.08 held in trust for the Industrial Board at their direction."[3] No funds were paid to the Industrial Board or the city at that time.

Based upon the investigation, the Board's new attorney on February 13, 1998, demanded payment of the defendant in the sum of $6,258.83 plus interest at 6¼% from September 1, 1994. The amount of $6,258.83 apparently represents the $8,000 profit from the sale less approximately $1,800 attorney's fees due the defendant for work performed in August 1994. In response to the letter, the defendant paid the Board $7,627.96 in full payment of this demand.

---

[3] The sum of these two figures is only $6,258.83; however, it appears the defendant was also due attorney's fees for the month of August 1994 in the approximate amount of $1,800. Thus, the combined figures account for the $8,000 profit from the sale.

## STANDARD OF REVIEW

The defendant contends the evidence is insufficient to sustain his conviction for either offense. In determining the sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). A jury verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). On appeal, the state is entitled to the strongest legitimate view of the evidence and all legitimate or reasonable inferences which may be drawn therefrom. *Id.* This Court will not disturb a verdict of guilt due to the sufficiency of the evidence unless the defendant demonstrates that the facts contained in the record and the inferences which may be drawn therefrom are insufficient, as a matter of law, for a rational trier of fact to find the accused guilty beyond a reasonable doubt. State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996). Accordingly, it is the appellate court's duty to affirm the conviction if the evidence, viewed under these standards, was sufficient for any rational trier of fact to have found the essential elements of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994).

Although the evidence of defendant's guilt is circumstantial in nature, circumstantial evidence alone may be sufficient to support a conviction. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987); State v. Buttrey, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). However, for this to occur, the circumstantial evidence must be consistent with guilt of the accused, inconsistent with innocence, and must exclude every other reasonable theory or hypothesis except that of guilt. Tharpe, 726 S.W.2d at 900.

While following the above guidelines, this Court must remember that the jury decides the weight to be given to circumstantial evidence. "The inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions . . . for the jury." Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958) (citation omitted); *see also* State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993).

## INTENT TO DEPRIVE

Defendant contends the state in both cases failed to establish beyond a reasonable doubt that the defendant intended to deprive the Board of the funds. We respectfully disagree.

A theft is committed "if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103. "Deprive" means to:

(A) [W]ithhold property from the owner permanently or for such a period of time as to substantially diminish the value or enjoyment of the property to the owner;

(B) [W]ithhold property or cause it to be withheld for the purpose of restoring it only upon payment of a reward or other compensation; or

(C) [D]ispose of property or use it or transfer any interest in it under circumstances that make its restoration unlikely.

Tenn. Code Ann. § 39-11-106(8). In ascertaining whether a defendant had the "intent to deprive" the owner of the property, the jury may infer such intent from the surrounding facts and circumstances. State v. Lowery, 667 S.W.2d 52, 57 (Tenn. 1984).

We view the evidence in a light most favorable to the state. With regard to the Kellwood transaction, the defendant, without consent of the Board, placed the Board's funds into his personal trust account in order to cover checks he had written a few days earlier. He was untruthful with his client when asked about the whereabouts of the funds. He was also untruthful with regard to the Wis–Con transaction when he stated there were no prior sales in which he handled funds. The defendant was never authorized or approved to borrow any of the Board's money. In fact, the defendant contradicted himself in his written statement but finally said, "I can't swear that I told Wright and Blakemore that I personally borrowed this money." The alleged promissory note was kept by the defendant and not seen by the Board until after the investigation had begun. The defendant's repayment of funds with regard to both transactions did not occur until after the defendant's termination.

At the very least the jury could reasonably conclude that the defendant intended to withhold these funds from the Board for a period of time, and the Board could have used these funds to make payment on its indebtedness at a 7% to 8¼% interest rate. Clearly, the funds were withheld for a period of time so as to "substantially diminish the value ... of the [funds] to the [Board]." *See* Tenn. Code Ann. § 39-11-106(8)(A).[4]

In essence, defendant contends it is not a criminal offense for one to knowingly take money that belongs to someone else as long as he or she subjectively intends to pay it back at some unknown future date. Under the defendant's theory, a bank teller could pocket a large cash payment by a customer on a bank loan and not be guilty of a criminal offense, as long as the bank teller had the subjective intent at that time to repay the funds at some indefinite time in the future. We reject this contention, especially since the intent of the 1989 Criminal Code was to abolish the distinctions

_____

[4]We further note that the City of Dyer was unlawfully deprived of funds since the Board's corporate charter required that all net earnings be paid to it. The defendant stated in his interview that it was his intent to "hide" these funds from the city.

-6-

among the previous theft-related offenses and consolidate them into the single offense of "theft." Tenn. Code Ann. § 39-14-101.

We further reject defendant's argument that his unauthorized acts are comparable to the joyriding statute classifying as a misdemeanor the unlawful taking of an automobile where the defendant "does not have the intent to deprive the owner thereof." *See* Tenn. Code Ann. § 39-14-106. The unauthorized taking of an automobile for a short time may well not meet the definition of "deprive;" thus, it is joyriding. *See* Tenn. Code Ann. § 39-11-106(8). The unauthorized taking of funds under the circumstances of this case does meet the definition of "deprive." *Id.*

We further reject defendant's reliance upon his repayment of these funds years after the unauthorized taking, and after he was terminated. Defendant, in essence, contends the repayment at 6¼% interest establishes that the Board was not prejudiced by the unauthorized taking. Firstly, we reject this contention factually since the Board was obligated on loans at a higher rate of interest than 6¼%. Secondly, and most importantly, repayment of funds improperly taken does not negate the intent at the time of the unauthorized taking. The crucial inquiry is whether the defendant had the "intent to deprive" at the time of the taking or at the time of exercising control over the property. *See* Tenn. Code Ann. § 39-14-103.

In summary, a rational juror could conclude beyond a reasonable doubt that the defendant, without the authority or consent of the Board, both took and exercised control over its funds in both transactions intending to withhold the funds so as to substantially diminish the value of the funds to the Board. This issue is without merit.

## BOARD'S CONSENT FOR POSSESSION OF FUNDS

Defendant contends the state failed to establish that he did not have the Board's consent with regard to the Wis–Con funds. He contends his January 1996 letter to the Board's private auditor unequivocally establishes he had the Board's consent to possess these funds. Again, we disagree.

Although Blakemore did not recall the 1994 Wis–Con transaction, he did testify that the Board never authorized or approved any loan to the defendant. Blakemore was unaware that any funds were missing with regard to the Wis–Con transaction until the investigation began. Upon being asked to repay the amount due, the defendant did so. The January 1996 letter was to the auditor and not the Board, and there is no showing that the Board ever consented to the defendant's use of these funds. Furthermore, the fact that the defendant advised the auditor that he set off certain attorney's fees against the trust funds provides no explanation for the remaining balance of over $1,000 for which there was no attempt to repay until he received the demand letter. Viewing the evidence in a light most favorable to the state, the record before us indicates that the Board did not consent to the defendant's personal use of these funds. This issue is without merit.

## CONCLUSION

Based upon a careful review of the record, we affirm the judgment of the trial court.

_____

JOE G. RILEY, JUDGE